1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF KENTUCKY
2  CENTRAL DIVISION AT LEXINGTON
                    - - -
3
   UNITED STATES OF AMERICA,      : Docket No. 20-cr-124
4                                 :
                    Plaintiff,    : Lexington, Kentucky
5                                 : Wednesday, March 16, 2022
                                  : 9:30 a.m.
6  v.                             :
                                  :
7  TAMI A. VEAL,                  :
                                  :
8                    Defendant.   :

9                    - - -
           TRANSCRIPT OF SENTENCING
10        BEFORE KAREN K. CALDWELL
     UNITED STATES DISTRICT COURT JUDGE
11                   - - -

12 APPEARANCES:

13 For the United States:      ERIN ROTH, ESQ.
                              U.S. Attorney's Office
14                            260 W. Vine Street
                              Suite 300
15                            Lexington, Kentucky 40507

16 For the Defendant:         BENJAMIN D. ALLEN, ESQ.
                              Gess, Mattingly & Atchison, PSC
17                            201 W. Short Street
                              Lexington, Kentucky 40507
18
   Court Reporter:            ELAINE S. HABERER, RPR
19                            Official Court Reporter
                              101 Barr Street
20                            Lexington, Kentucky 40507
                              (859) 469-7456
21

22

23

24
       Proceedings recorded by mechanical stenography,
25 transcript produced by computer.

1    (Proceedings commenced in open court at 9:36 a.m.)

2    THE COURT:  Would the clerk please call the matter to

3    come before the Court?

4    COURTROOM DEPUTY:  Yes, Your Honor.

5    Lexington Criminal Action Number 20-124, United States of

6    America v. Tami A. Veal, called for sentencing.

7    THE COURT:  Would the United States make its

8    appearance for the record?

9    MS. ROTH:  Good morning, Your Honor.  Erin Roth on

10   behalf of the United States.

11   THE COURT:  Ms. Roth.

12   For the defense.

13   MR. ALLEN:  Good morning, Your Honor.  Ben Allen on

14   behalf of Defendant, Tami Veal.  Ms. Veal is present in the

15   courtroom this morning and she's seated here to my left.

16   THE COURT:  Mr. Allen, Ms. Veal.

17   This matter is called on for a sentencing hearing.  Has

18   the United States received and reviewed all of the relevant

19   sentencing materials including the memoranda that have been

20   filed along with the first and second addenda to the

21   presentence report?

22   MS. ROTH:  We have, Your Honor.

23   THE COURT:  I noted there was an objection which was

24   accepted by the probation office, and any objection to it was

25   withdrawn by the defendant regarding the five-level

1    enhancement.

2        Is that correct, Ms. Roth?

3            MS. ROTH:  That's correct, Your Honor.

4            THE COURT:  Is that correct, Mr. Allen?

5            MR. ALLEN:  Yes, Your Honor.

6            THE COURT:  And then I believe the objections were

7    favorably resolved in favor of the defendant regarding the

8    knowing distribution.

9        Is that also correct, Ms. Roth?

10            MS. ROTH:  It is.

11            THE COURT:  Mr. Allen?

12            MR. ALLEN:  That's correct, Your Honor.

13            THE COURT:  So I don't think I have anything else

14   that I need to resolve, unless you want to bring it to my

15   attention now.

16       Ms. Roth?

17            MS. ROTH:  I think that's correct.  You have nothing

18   to resolve, Your Honor.

19            THE COURT:  Mr. Allen?

20            MR. ALLEN:  That's correct, Your Honor.

21            THE COURT:  And Mr. Allen, have you and your client

22   received and reviewed all of the relevant sentencing

23   materials?

24            MR. ALLEN:  Yes, Your Honor.

25            THE COURT:  All right.  With all of the objections

1    having been resolved, the Court will adopt the factual

2    findings and the advisory guideline applications that are set

3    forth in the presentence report.

4       Accordingly, the Court determines that the appropriate

5    advisory guideline range for this defendant as it pertains to

6    the counts of conviction is 360 months, which is the statutory

7    maximum on Count 1, with the offense level of 42, and a

8    criminal history category of 3.

9       Are there any motions from the United States, Ms. Roth?

10          MS. ROTH:  Only for the third level, Your Honor.

11          THE COURT:  All right.  And that's been taken into

12    account in the calculations.  I have received a sentencing

13    memoranda from the United States, and a motion and memorandum

14    in support of a downward variance from the defense in this

15    case.

16       I have also been asked to consider whether a victim would

17    like to make a statement.

18       Ms. Roth?

19          MS. ROTH:  Your Honor, I would note that the victim

20    is here in the courtroom with her representative who is her

21    sister.  Both of these are the daughters of Ms. Veal.  Her

22    other daughter is also here as well as her mother.

23       I was told this morning, that they're a little unsure if

24    they want to make a statement.

25          THE COURT:  It's entirely up to you.

1    SPEAKER:  Yeah, I would.

2    THE COURT:  Please come forward and stand at the

3    microphone so the Court can hear you.

4    And tell me what your name is, ma'am.

5    SPEAKER:  I am ███████████.  Sorry.

6    THE COURT:  That's fine.  Take your time.

7    SPEAKER:  The oldest daughter of Tami Veal and the

8    oldest sister of ██████ and ██████ who are here -- back here

9    with us.

10    Judge Caldwell, I did submit a letter to you, which I

11    assume you've been able to read and see, so ...

12    THE COURT:  I have.  I have filed them all in the

13    record under seal.

14    SPEAKER:  Okay.  And thank you for taking the time to

15    read that.  Aside from what I've already expressed to you in

16    that letter, I'm not sure what else there is really at this

17    point to say, other than, first, the specific reason for us

18    being here today is sentencing.  And I just again ask that,

19    when sentencing, I ask that you take a little bit of a stance

20    of mercy so that, at some point, our family can begin to heal

21    someday.

22    My mother deserves to be held accountable for her actions

23    and the pain that she's caused from her decisions.  I believe

24    she's where she's supposed to be for now, but for the, you

25    know, the remainder of her life or the potential to build and

1   rehabilitate our family is -- I think is possible.  The person

2   that she was before drugs took control of her life, and some

3   of that she allowed.

4          And I want to speak for ████████.  I think that she has a

5   lot of hurt that she's not ready to forgive, and I just hope

6   that someday we might be able to do that.  But on her behalf,

7   I don't know that there is much that can be said or done right

8   now to take that pain away and the time that was stolen from

9   her and her childhood.  But she is going to be a grown woman

10  soon and a mother herself, and I just hope that, if there is

11  any way, and it's God's will, that we can be a family again

12  someday.  So that's all I have to say.

13          THE COURT:  Thank you very much.

14          SPEAKER:  Thank you.

15          THE COURT:  Is there anyone else who would like to

16  speak at this time?

17          MS. ROTH:  No, Your Honor.

18          THE COURT:  Thank you very much.

19      Ms. Veal.

20          THE DEFENDANT:  Yes, ma'am.

21          THE COURT:  I'm going to hear from the lawyers in

22  just a minute, but is there anything you would like to say to

23  the Court to aid it in determining the punishment in this

24  case?  And if you would like to, you can just remain seated

25  and speak into that microphone.

1　　　　　THE DEFENDANT:　I have prepared a letter, if I can

2　　read it to you.

3　　　　　THE COURT:　All right.

4　　　　　THE DEFENDANT:　Thank you.　Your Honorable

5　　Judge Caldwell, I found myself in a place that I would have

6　　never thought, dreamed, or imagined.　It has been a nightmare

7　　for my daughter and for me, and for my whole family.　When

8　　Detective Gadson came to my house --

9　　　　　COURT REPORTER:　Can you slow down?

10　　　　　THE DEFENDANT:　Yes, ma'am.

11　　　　　THE COURT:　She's taking down everything you're

12　　saying, and when we read, we tend to speed up.

13　　　　　THE DEFENDANT:　Yes, ma'am.　When Detective Gadson

14　　came to my house to tell me that justice for Cory Johns was

15　　going to be served, I was so glad.　But when he told me that I

16　　was involved, my joy turned to confusion and pain.

17　　　　When I was arrested, I thought that I had died and gone

18　　to hell.　When I woke up in my cell in the dark and alone, I

19　　remember thinking that if I could only bleed or draw blood

20　　that I would know that I was alive.

21　　　　The only reason that I knew that I wasn't in hell was

22　　that I could feel love.　Love from God, love from my parents,

23　　love for my children.　I remember being alone and heartbroken

24　　and very cold.

25　　　　A guard brought me an extra blanket, and I thought to

myself, wow, that was an act of compassion, so I can't be in hell because I know that hell is separation from God, for God is love.

I would like to tell you a little bit about myself. I am from a good family, from God fearing, law-abiding citizens; from good stock. Life happened and my parents divorced when I turned seven years old, but God was always with me. I gave my life to Jesus when I was 11 years old and he spoke to me and said, I want to come into your heart and love you and be your friend.

I got baptized in my church, the Disciples of Christ, and when I came up out of the water, I was crying for joy. I'll never forget that.

In January of 1991, I married my high school sweetheart, David Plunkett. I got pregnant with my first daughter, ███, during my freshman year of college at Eastern Kentucky University. During our marriage he became abusive due to alcohol, and the abuse continued for a number of years. But with the help of Jessamine County victim advocate Taunya Northup and the Nicholasville Police Department I got out of that relationship with my two young daughters.

We went through hell, but I maintained to be an excellent mother. I participated in my community by working, going to church, teaching Sunday school, coaching cheerleading, and going back to college. I graduated from Sullivan College in

1999 with an associate's degree.  I had also become a
certified nursing assistant and a realtor at Veal Associates
and Auctioneers.  I was a member of the Lexington Board of
Realtors.

I later reconciled with my ex-husband due to his
relentless efforts, because I longed for the perfect family.
I had known what it felt like to be a child of a torn parental
unit and wanted to avoid the trauma that comes with it for
███████ and for ████████.

It turned out to be a vicious cycle of abuse and I
divorced him for a second time.  Looking back at that
situation, I know it wasn't just all him.  I learned through
therapy through the years that I have an issue with
co-dependency and have confused being loved and cared for with
unhealthy relationships.

In 2006 I found myself in the midst of the most evil of
all relationships when I got involved with Cory Johns.  It
didn't take long for me to feel like I was living in a
real-life horror show.  To be paired with him as a
co-defendant in this case makes me sick to my very core being.

I cannot begin to explain how terrible it has been, but I
will try.  During our relationship I have been bitten,
punched, choked, kicked, cut, stabbed, dragged, urinated on,
bruised, and totally controlled by him.  I've even been
drugged by him.  Although I do take responsibility for my own

drug addiction.

I became his obsession and his possession, and I was scared beyond imagination. He told me that if I ever tried to leave him that he would Kunta Kinte me, cut off my feet, so I couldn't run. He made a doll into a lampshade and portrayed the doll as myself. He cut her feet, cut her eyes out, he sewed her mouth shut, spreading her legs, he put a knife between them and poured red tattoo ink all over the doll to represent me bleeding to death.

He has a tattoo on his upper leg of me and he is setting behind me, reaching around and clutching my private parts and holding a knife to my throat. I neglected spending time with my three daughters, ████, ████, and ████, and my entire family while under his evil control, and continued to live out this real-time horror show in fear.

In December of 2001, I found hundreds of images of naked little girls on a laptop of Cory's and turned it over to the Nicholasville Police Department. I spoke with Officer Brian McClure. I once again reached out to Taunya Northup, the victim's advocate, and we got him out of my house and away from me and my children.

I got an EPO from the judge and then took ████ to the hospital to get her checked for any sexual abuse. The female doctor told me that there had been no signs of any abuse. It has been so difficult, so heartbreaking for everyone involved

to find out that ███████ had been exploited.  I never, and
again, I say never, intended on hurting ██████, but that is
what happened.  On drugs or not, whether I remember it or not,
it's what's happened.

Before my drug addiction, before the nightmare began, I
had always been a good mother.  My heart is broken for ████████
and for my two other daughters and myself.  Most of all for
███████.

It is true that I was on drugs and stayed in an unhealthy
relationship out of fear, manipulation, and abuse.  But at the
end of the day, I am ████████ mother and she is my child, and
my number one job was to protect her, and I did not do that.

About 12 years ago, ████████ and I were both naked on my
bed, Cory Johns was videotaping, and I said something to her
that caused her to react in a sexually explicit manner.  That
was my fault and I take full responsibility for my actions.

However, I had no knowledge or intent of what he would do
with that video.  This whole situation has made me so angry,
and I'm so scared for ████████, and I'm so hurt for her.

I worry so much about how this will be on her for her
whole life.  Everything about this is sickening, and I think
of her and pray for her constantly.

My family has tried to make sense of all this.  And while
I face this charge, I know that love and forgiveness, and God
can heal us all.  I pray that God protects ████████ and all of

my children from a dark cloud that will hang over them because of all this.

Your Honor, I can't take things back; God knows that I would if I could. Since my final separation from Cory Johns, I have completed drug rehabilitation at Chrysalis House in Lexington in June of 2001, as well as anger management therapy. And up until my arrest, I was a client at New Vista Comp Care, and I was heavily involved in AA and saw a peer mentor twice a week named Glenda Smith until August 25th, 2020.

And that was the only healthy relationships with my daughters and grandchildren. I ask that you consider my children and my mother and my grandchildren. I lost my father this past October, the 20th, and had to say good-bye over a video call. I didn't get to go to his funeral. My mother is 74 and I may never see her again.

My grand babies are 11, 9, and 5. I will miss out on watching them grow up, and I don't want this to be the end of my life. I humbly ask you to consider them most of all.

I ask for years at the end of my life just being with ▬▬▬▬, to love her, and to be there with her and to help her heal.

I'm 50 years old and I pray I can come home in time to be with my family and my babies, ▬▬▬▬, ▬▬▬▬, ▬▬▬▬, ▬▬▬▬, ▬▬▬, and ▬▬▬. I will, to the best of my

1    ability, try to heal the family and to put back all the broken

2    pieces.

3         Thank you for your time.

4              THE COURT:  Thank you very much.  Would you like me

5    to file the letter in the record?

6              THE DEFENDANT:  Yes, ma'am.

7              THE COURT:  All right.  Mr. Allen.

8              MR. ALLEN:  If I may, Your Honor.

9              THE COURT:  You may.

10        Thank you, ma'am.

11        Mr. Allen.

12             MR. ALLEN:  Judge, if I may address the Court from

13   the table?

14             THE COURT:  You may.

15             MR. ALLEN:  First, I would like to thank Ms. Veal's

16   family for being here today and for ███████ for her statement.

17   This is a very difficult case, not only for what happened.

18   But also, because I've been representing Ms. Veal now for well

19   over a year, and she's explained to you, she's very remorseful

20   for what's happened and for the conduct that led her to that

21   point.

22        She fully realizes the long-term impacts this has on not

23   only her youngest daughter, but her other kids and their

24   grandkids.

25             And for that reason, among others, Your Honor, we had

filed a motion for a downward variance. And we believe the 3553 factors here merit such a variance. And just, it's a pretty lengthy memorandum, I won't read it to you verbatim, but just to summarize, Judge, as far as the facts, and the nature and circumstances of the facts, and Ms. Veal's characteristics, we argue in our memorandum that she's not what we consider a typical child production offender.

We believe that's backed up by the data that we cited to the Court, and also by the fact that you know, according to the indictment, if that's the end date of the conduct in February of 2013, there's no indication, since that date until present, until the date of her arrest, that she engaged in any similar conduct.

There's no evidence she ever possessed child pornography, participated in online child pornography communities, or engaged in sexual contact with, first off, with her own kids or with any other minors.

So for that reason, we don't believe the nature and circumstances of Ms. Veal places her in the same category as what we would consider a typical child production offender.

Ms. Veal has already discussed, and we provided evidence in our memorandum, about the long-term physical and mental abuse she suffered at the hands of Cory Johns. And not to belabor the point, but we've attached several EPOs to our memorandum that she obtained. And the PSR documents several

instances of abuse, including biting, putting cigarettes out on her skin, ramming his thumb into her left eye socket, and threats to cut off her feet and kill her family.

That, along with their mutual drug use during this period, and as the victim's advocate, Ms. Mendenhall, explains to the Court, exercised a significant amount of control over her life and put her, as ███ said, in a very dark place.

That, of course, is not an excuse as to what happened, but I think provides context as to how she may have found herself in a place where something she would never thought would have happened, happened.

And we also touched upon in our memo, Judge, and the PSR, and as Ms. Veal told you, once she was able to sort of break away from Mr. Johns, she did take steps to fix some of the problems she had. She'll admit those are problems of substance use disorder. She's going to deal with that the rest of her life, but she had taken steps at post-offense rehabilitation to try to address some of these issues, including, most importantly, finally breaking away from Mr. Johns.

As far as the statutory objectives go, Your Honor, no doubt this is a serious offense. It is one of the most serious offenses, and it took place against Ms. Veal's minor daughter. There's no disputing that, and Ms. Veal acknowledges that.

With that said, the mandatory minimum sentence here of 15 years is still a substantial sentence. And we believe, Judge, that not only provides deterrence to Ms. Veal, but even if the Court were to impose that sentence, would still provide general deterrence, just because a 15-year sentence is still very substantial.

And, Judge, I touched upon -- I did note a policy disagreement in my memorandum with the production guideline itself and the five-level enhancement of 4B1.5. The Court is free, of course, to vary downward or depart based on policy disagreements. We think that there is a disconnect between what 3553 calls for and what the guidelines call for in these cases, and that's another reason that we've pointed to for a variance.

But to close, Judge, and I think the most important point is, I'm going to quote what ████ said in her letter, and that is that she believes that her mother, and I believe that her mother is capable of finding herself again.

Like I said, I've been representing Ms. Veal for over 15 years [sic]. During this period, I could tell a noticeable change from the first time I met her right after arrest until now. She is committed to addressing the many things that led her to this point. She's committed to reconnecting with her family, which they are here, and I know for a fact that they love her very much.

1    She's committed to reconnecting with them and fixing,

2    hopefully, the riffs that have developed because of her

3    conduct.  All she's asking for is the opportunity to be

4    released from BOP with enough time left in her life to do that

5    and to enjoy her grandkids.

6    That may not be possible with a 30-year sentence, but it

7    might be possible with a 15-year sentence, and that's the

8    reason, Judge, we're asking for a variance here.  And not only

9    for the mandatory minimum term of imprisonment, but for a

10   lesser term of supervised release as well.  Thank you.

11              THE COURT:  Thank you.

12        Ms. Roth.

13              MS. ROTH:  I struggle with this case, Your Honor.

14   It's difficult all the way around, as I think everyone in the

15   room acknowledges and has heard.

16        As Mr. Allen said, this is one of the most serious

17   offenses.  And I think hearing from the defendant's daughters

18   show why, particularly in this case where the offender is a

19   family member.  It tears apart the fabric of an entire family,

20   and those ripples last and last and last.  There is no going

21   back, unfortunately, as Ms. Veal says she wished she could.

22   And the effects of this crime are going to be something that

23   this victim has to deal with for the rest of her life.

24        I do not disagree that Ms. Veal and Mr. Johns had what

25   was, I think by anyone's description, a violent, troubled

relationship. I have reviewed a lot of evidence that was
taken from Mr. Johns' room, including pictures of him with
Ms. Veal, and they're violent. They are violent. They're
concerning.

The content is pictures of, as she said, knives and
cigarettes and fake pictures of blood and death, and it
just -- it is disturbing stuff.

And so, you know, I don't disagree that there was
certainly a component of control and manipulation that was
occurring. Of course, from Mr. Johns' perspective, his
argument is that that was occasioned by Ms. Veal.

Again, the tumultuousness of this relationship, I think,
in some respects, just, they did not mix and it was explosive.
And I'm glad that she had gotten herself out of that
relationship, but unfortunately, for this crime, the damage
had already been done.

As the Court can tell from the indictment, the videos
that we have span a period of five years, and as much as
Ms. Veal would like to focus on one video, we showed all of
those to the probation office, and they agreed with us that
it's not just one video in this case that meets the definition
of sexually explicit conduct, it's multiple videos.

Ms. Veal is in those with Mr. Johns. Some of them she's
filming, some of them she's just in the video and he's
filming. You know, back and forth, but it's clear to me that

1   this was conduct that they were both engaging in, which is why

2   we charged them both in this indictment.

3       And I will say that Ms. Veal, from the beginning of this

4   case, has accepted responsibility, and I think she deserves

5   immense credit for that.  It's not an easy case to take

6   responsibility for.  The penalties she's facing are

7   significant.  But she's done it, and she has maintained that

8   acceptance throughout the course of this litigation, in

9   contrast to Mr. Johns.  And I do think that she deserves some

10  credit from the Court for that decision and for minimizing the

11  effect that this would have on her daughters if this case

12  proceeded to go to trial, especially against her.

13      Pitting a daughter to testify in a case against their

14  mother, I mean, the emotional difficulty that that would

15  present is something none of us wanted.  And again, to her

16  credit, she has accepted responsibility in this case.

17      The guidelines here are significant.  It's 360 months to

18  life.  Of course, the statutory maximum in this case is 360,

19  so effectively makes her guideline range 360.  I don't

20  actually disagree that something less than that would be

21  appropriate in this case.  However, 15 years at the bare

22  minimum would be half and I think that's too much.  I think

23  that's too much of a reduction in this case.

24      And balancing all of the factors, I do agree, I think

25  Ms. Veal is intelligent, I think she's got promise, and I

think she has the capability to turn her life around, and eventually, hopefully, to rebuild a positive relationship with her family.

But unfortunately, in this case, we can't undo the damage that's been done. And the need for the sentence to reflect the seriousness of the offense, to protect the public, to promote respect for the law, and hopefully to provide additional drug counseling services for Ms. Veal so that this isn't a contributing factor when she gets out, I think all do warrant against the sentence at the minimum of the range, and we would leave it where in that range in the Court's discretion. Thank you.

THE COURT: Thank you.

MR. ALLEN: Judge, if I may?

THE COURT: Yes, you may.

MR. ALLEN: I forgot to ask for two recommendations.

THE COURT: Oh, certainly.

MR. ALLEN: First, and I will concede, I don't know whether this would result in any time off in her sentence, but given the past drug use, if the Court would recommend her participation in the RDAP program.

THE COURT: I will.

MR. ALLEN: And number two, recommend her placement, perhaps at the BOP facility that's closest to her daughter in Indiana.

1          THE COURT:  All right.  This case is indeed --

2      Yes, ma'am.

3          SPEAKER:  Excuse me, may I?

4          THE COURT:  You may.

5          MS. ROTH:  I've just been informed that the victim

6      would like to say something to the Court before you pronounce

7      sentence.

8          THE COURT:  She may.

9      Yes, ma'am.  And would you spell your name, your first

10     name for me?

11         SPEAKER:  You said spell it?

12         THE COURT:  Yes.

13         SPEAKER:  It's ███████████.

14         THE COURT:  All right.  I just want to be sure we had

15     your spelling correctly.  You may, ma'am.

16         SPEAKER:  I just wanted to tell a story about the

17     last time that I had a real-life interaction with my mother.

18     It was not good.  The last time that I saw my mom was at my

19     grandmother's house, and she had just gotten back from doing,

20     you know, what she would do usually.  She came in and she was

21     completely manic, like, running around the house, like,

22     looking for something.

23     I was laying on the couch.  She came over to me and was

24     like, laying over me.  So I said, "Do you need help with

25     something?"

1       And she said, "I'm looking for my charger."

2       And I'm like, "Okay.  Well, it's behind my head."

3       And she was like, "Well, if you weren't so fucking fat

4   then maybe I would see it."

5       And I was like, okay.  And I, like, I rolled my eyes or

6   something, and -- sorry, I'm a little bit shaky right now.

7           THE COURT:  All right.

8           SPEAKER:  She said, "Don't you disrespect me.  I'm

9   your mom."

10      And I was just done at that point.  So I said, "How am I

11  supposed to respect you if you've never been a mother to me a

12  day in my life?"

13      And then she just started going in on me saying, "I hate

14  you.  You're the reason why I am the way I am."

15      Just the normal, which this wasn't, like, an unusual

16  thing to be spoken to me.  And she had found out recently that

17  I smoked weed.  So she said that I would end up just like her.

18  And that -- yeah, she said that.

19      And she, after that, after I went home to Indiana with my

20  sister, she was texting me every day.  "I'm sorry."  "I love

21  you."

22      She was texting me good night and good morning every day

23  and I didn't respond to a single message.  The whole time I

24  was just hoping and praying that she would get out of my life.

25      And then about two weeks later, I found out that she had

gotten arrested, and for a really long time I thought that I was the reason why she was in here because, you know, I was the reason why anything ever happened to her, according to her. But I realize now that it wasn't my fault at all.

But basically the point of all that is that I don't think I'm ever going to have a relationship with her, ever in my life. It doesn't matter if she's in there for five years or 50 years. But she still has the potential to have a relationship with my two other sisters and my nieces and nephew.

So I think that -- I don't think she deserves that, I think that they do. I think they deserve that. That's all.

THE COURT: Thank you very much.

SPEAKER: Thank you.

THE COURT: Since I first received this case, I think I, like most of you, have been confused, frustrated, offended, angered by all of the things that we see here. This case is indeed an unusual case. It's an atypical offender, an atypical offense. But regardless of its atypicality, it is an offense and a very, very serious one.

The harmful effects of this crime, as we've just heard, cannot be undone, and may last a lifetime. Moreover, the harmful conduct didn't just occur once or during a short period of time in which there was some sort of intensity of abuse, or some sort of intensity of drug use. It occurred

1    repeatedly over a period of time.

2        I believe that Ms. Veal needs psychological treatment,

3    and drug treatment, she's already gone down the right path

4    toward healing those things, and it seems to me that much of

5    the actions in this case stem from some psychological issues

6    that entangles her and re-entangles her with abusive men.

7    Cory Johns not being the first, but possibly the worst.

8        Also, Ms. Veal's substance abuse and drug addiction

9    appears to be entwined with her problems with men,

10   particularly violent men.  She'd get out, she'd get some help,

11   and then she'd go right back.  I know that that is a vicious

12   cycle in abusive relationships.  And hopefully, there will be

13   an opportunity for the defendant to get help for that and, if

14   nothing else, be freed from it while incarcerated.

15       You know, at first blush, 30 years almost doesn't seem

16   like enough for the kind of crime that has been committed.

17   But this defendant already has made some progress in terms of

18   making up for her wrongdoing, trying to change her life.  I

19   believe that justice should be tempered with mercy.

20       And accordingly, it's the judgment of this Court that the

21   defendant is committed to the custody of the Bureau of Prisons

22   to be in prison for a term of 240 months, or 20 years.  This

23   is a significant departure, but it's also a significant

24   sentence for somebody who is 50 years old.

25       It's recommended to the Bureau of Prisons that the

defendant participate in psychological treatment that involves sex offense treatment and psychosexual counseling. I'm not sure that the Bureau of Prisons really has any programs for female sex offenders like they do at Butner for male offenders, but I believe that this is all tied up in a larger psychological issue. So whatever counseling and treatment is available, Ms. Veal needs to have it.

It's also recommended that she participate in substance abuse treatment up to and including the RDAP program.

Now, Ms. Veal, when you are released from prison, you will be on supervised release for a term of life. That makes me more comfortable with making such a significant departure from the guidelines.

Within 72 hours of your release from the Bureau of Prisons, you must report in person to the probation office in the district to which you're released. And while you're on supervised release, you shall not commit another state, local, or federal crime, and you must comply with all of the mandatory and standard conditions that have been adopted by this Court along with the following:

You must not possess a firearm, destructive device, ammunition, or a dangerous weapon. That would be against the law because you're a convicted felon. You must refrain from any unlawful use of a controlled substance and you must submit to one drug test within 15 days of your release from prison

and two periodic drug tests thereafter.

You must comply with the following special conditions:

You must participate in substance abuse treatment and submit to periodic drug and alcohol testing all at the direction and the discretion of the United States Probation Office. You shall not tamper or attempt to manipulate any drug testing mechanisms. And if your probation officer determines that you should be placed in substance abuse treatment, then you must participate in that course of treatment as directed by the probation office, until you are released by the probation office.

You must not purchase, possess, use, distribute, or administer any controlled substances or paraphernalia related to a controlled substance unless it's prescribed by a physician. And then, you must use the controlled substance as directed by your physician.

You shall not frequent places where controlled substances are illegally sold, used, distributed, or administered.

You must participate in a program for treatment of mental health or sexual disorders, and you must submit to a sex offender risk assessment, psychosexual evaluation, or other evaluation as deemed appropriate by the United States Probation Office. You must remain in those programs until you are released by the probation office.

Your residence and your employment must be pre-approved

by the probation officer and comply with state and local law.
You must not frequent, volunteer, or work at places where
children under the age of 18 congregate.  Things like
playgrounds, daycare centers, or other such matters, unless
it's approved in advance by the probation office.

And unless it's preapproved by the probation officer, you
must have no contact with the victim in this case, who has
expressed here today that, at least at this point, she doesn't
want to have any contact with you.

You must not associate or have verbal, written,
telephonic, or electronic communication with any person under
the age of 18 without the permission of the probation officer.
But that doesn't include people like ticket vendors or people
that you have to come into contact with in regular commercial
services.

You must not view, listen to, or go to locations where
any form of pornography, sexually stimulating performances, or
sexually oriented materials, items, or services are available.
You must not possess or use a device capable of creating
pictures or video unless you have approval by the probation
office.

You must not rent or use a Post Office box or storage
facility without the approval of the probation office.  And
you must register as a sex offender as prescribed by state
law.

1    You must not use a computer or device with access to

2  online computer service at any location, including your place

3  of employment, unless you have the prior approval of the

4  probation office.

5    You must consent to the probation office conducting

6  unannounced examinations of any computer system of which they

7  have approved.  And that would include the internal and

8  external storage devices which may include retrieval and

9  copying of all the memory from the hardware or software or

10  removal of the system itself.  And you must submit it to a

11  periodic inspection of any hardware or software that is used

12  to make sure that it's functioning properly.  In other words,

13  they can install on your computer hardware that tracks and

14  monitors your computer use.

15    You must submit your person, residence, office, vehicle,

16  or property to a search conducted by the United States

17  Probation Office at a reasonable time and in a reasonable

18  manner, based upon reasonable suspicion of contraband or

19  evidence of a violation of condition of release.  Failure to

20  submit to that search could be grounds for revocation of your

21  supervised release.

22    The Court does not have a financial statement of

23  restitution.  Do we expect to have one, Ms. Roth?

24    MS. ROTH:  I've been told that we do not expect to

25  have one.

1    THE COURT:  Very well.

2    Mr. Allen, is that your understanding as well?

3    MR. ALLEN:  It is, Your Honor.

4    THE COURT:  All right.  Then I will not impose any

5    financial conditions on this defendant.  To some degree, these

6    sex offender limitations don't necessarily apply to this

7    particular defendant, but giving the probation officer the

8    discretion to grant leniency as to some of this, I think, is

9    the best way to handle it rather than to reduce the

10   requirements, which mostly are statutory.

11   The defendant does not have the money to pay a fine,

12   therefore, none will be ordered.  But you have to pay a

13   special assessment of $100, that's due immediately.

14   The defendant must forfeit to the United States all

15   interest in items listed in the forfeiture allegation.  I

16   believe that's the tapes; is that correct?

17   MS. ROTH:  Yes, Your Honor, it's all electronic items

18   that are related to the offense.

19   THE COURT:  All right.  The Court will recommend that

20   the defendant be housed in Indiana at a facility of the Bureau

21   of Prisons that's nearest her daughter, and at one which she

22   will be appropriately housed in terms of her security

23   clearance.

24   Is there any legal reason sentence should not be imposed

25   as stated, Ms. Roth?

1           MS. ROTH:  No, Your Honor.  And I would just note for

2  the record that there is a special assessment provision

3  that -- but it only applies if the Court finds that a

4  defendant is not indigent.

5     I think in this case that there's not an argument here

6  that she's not indigent, but I just want to make sure that

7  it's reflected that we considered that issue.

8           THE COURT:  Thank you for raising that.  And I think

9  there is no evidence to the contrary that the defendant is

10  indigent and that that particular special assessment would not

11  apply.

12     I take it you don't object, Mr. Allen?

13           MR. ALLEN:  No, Judge.

14           THE COURT:  Okay.  Are there any other legal

15  objections, Mr. Allen?

16           MR. ALLEN:  Judge, since Ms. Veal has preserved her

17  right to appeal, I believe *Bostic* -- the only objection *Bostic*

18  would require would be the length of the term of supervised

19  release, just to preserve that for any report on appeal.

20           THE COURT:  Very well, you may.  And again, the Court

21  extended the supervised release period to justify what is

22  essentially a 30-percent reduction in the guidelines.

23           MR. ALLEN:  I completely understand, just in case of

24  appeal, Judge.

25           THE COURT:  I understand.

1    Ms. Veal, I want you to listen very carefully.  The clerk

2    of court is going to give you some information regarding your

3    right to appeal.

4    I know Mr. Allen is going to take good care of you, but

5    I'm required to give you this information.  I'll give you a

6    copy to keep for your records, and I'll ask you and Mr. Allen

7    to sign a copy and return it to the Court.

8    (The form entitled "Court's Advice of Right to

9    Appeal" was read aloud in open court by the clerk, and said

10   form was signed by the defendant.)

11   THE COURT:  All right.  Thank you, Mr. Allen.

12   That concludes this proceeding.  Parties and counsel may

13   be excused.  We'll be in recess.

14   (Proceedings concluded at 10:48 a.m.)

15                              - - -

16               C E R T I F I C A T E

17        I, ELAINE S. HABERER, RPR, certify that the
     foregoing is a correct transcript from the record of
18   proceedings in the above-entitled case.

19

20   _/s/ Elaine S. Haberer___          June 23, 2022
     ELAINE S. HABERER, RPR             Date of Certification
21   Official Court Reporter

22

23

24

25